

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:12cr358 |
| | ) | |
| JOSE ABAD HEREDIA PRADO, | ) | |
| also known as "Pava," | ) | Honorable Leonie M. Brinkema |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1. From in and around April 2012 through in and around August 2012, both dates being approximate and inclusive, within the jurisdiction of the United States and in an offense begun and committed outside the jurisdiction of a particular state or district, the defendant JOSE ABAD HEREDIA PRADO, a/k/a "Pava," who was first brought to the Eastern District of Virginia, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with others to unlawfully, knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 960 and 963.

2. Between April and June 2012, the Drug Enforcement Administration ("DEA") and the Colombian National Police ("CNP") conducted an undercover investigation in Colombia, using two confidential informants ("CS-1" and "CS-2," or collectively "the CSs") and an undercover law enforcement officer (the "UC"). As part of this operation, CS-1 and CS-2 agreed to purchase approximately eight kilograms of cocaine from an international drug trafficking organization ("DTO") based in Colombia for subsequent distribution in New York. CS-1 and CS-2 represented to the DTO that the proceeds of the drug sales in New York would later be used to fund the DTO's transportation of a larger load of cocaine by airplane. Evidence gathered during this investigation, to include recorded telephone calls, recorded meetings, physical surveillance, and information provided by CS-1 and CS-2, established that the defendant was a member of the DTO who helped secure air transportation of large loads of cocaine from the Apure region of Venezuela to Honduras and elsewhere. The defendant helped broker this eight kilogram transaction along with his co-conspirator SANES SAAVEDRA, and received a commission for doing so.

3. As part of this investigation, on or about April 13, 2012, the CSs met with the defendant and HUGO ENRIQUE SANES SAAVEDRA (SANES SAAVEDRA), also known as "Geova," "Geovanny," and "Giovanni," in Colombia. During this meeting, the CSs represented to the defendant and SANES SAAVEDRA that they could procure aircraft to transport large loads of cocaine internationally. SANES SAAVEDRA expressed reluctance to pay the CSs upfront, but agreed to sell eight kilograms of cocaine to CS-1 and CS-2 with the understanding that CS-1 and CS-2 would distribute the cocaine in New York to maximize profits. Cocaine that is acquired in Colombia for approximately $2,500 to $3,000 per kilogram can be sold in

New York for approximately $30,000 per kilogram. CS-1 and CS-2 told the defendant and SANES SAAVEDRA that they would use the proceeds from the sale of the eight kilograms of cocaine in New York to fund the transportation of a much larger load of the DTO's cocaine.

4. Following this meeting, on or about April 18, 2012, CS-1 recorded a telephone call with an uncharged co-conspirator ("UCC-1"). During this call, CS-1 and UCC-1 used coded language to discuss the plan to transport cocaine to the United States. CS-1 told UCC-1 that they will be able to get funding from "spare parts" (meaning kilograms of cocaine) that will be sent to New York.

5. Thereafter, in a recorded call on or about April 27, 2012, CS-1 told SANES SAAVEDRA that CS-1 needed eight kilograms of cocaine. SANES SAAVEDRA advised CS-1 that he would have the eight kilograms ready in about eight to ten days. SANES SAAVEDRA agreed to contact CS-1 once the cocaine was ready to be sold to CS-1 and CS-2. SANES SAAVEDRA and CS-1 agreed that CS-1 would pay $2,900 per kilogram of cocaine. SANES SAAVEDRA guaranteed that there would not be any complaints regarding the sale of the eight kilograms of cocaine.

6. During a recorded meeting in Colombia on or about May 23, 2012, the CSs met with Marlon Geovanni Canelas Rodriguez (CANELAS RODRIGUEZ) and another individual regarding the transfer of the cocaine to CS-1 and CS-2. CANELAS RODRIGUEZ explained that SANES SAAVEDRA was ill, and that he (CANELAS RODRIGUEZ) had been appointed to handle the deal. CANELAS RODRIGUEZ offered to take one of them (CS-1 or CS-2) to the "kitchen." The CSs understood that CANELAS RODRIGUEZ was using the word "kitchen" as a code for cocaine stash location. During the meeting, CS-2 received a text message from

SANES SAAVEDRA which was intended for CS-1. In the text message, SANES SAAVEDRA indicated that everything was ready for the deal to move forward.

7. On or about May 25, 2012, the CSs traveled to a hospital in Colombia, where SANES SAAVEDRA was admitted. During a meeting with the defendant at the hospital, the CSs and SANES SAAVEDRA discussed the issues the CSs were having with CANELAS RODRIGUEZ regarding the planned eight- kilogram transaction. The CSs indicated that they would prefer to deal directly with SANES SAAVEDRA. SANES SAAVEDRA apologized to CS-1 and CS-2 for causing any inconvenience because of his health. CS-1 confirmed that CS-1 would continue to work with the defendant, and SANES SAAVEDRA told CS-1 he needed his "small car" (meaning small aircraft) urgently. CS-1 told SANES SAAVEDRA that the defendant would have to pay first.

8. On or about June 1, 2012, CS-1 had a telephone conversation with SANES SAAVEDRA. During the call, SANES SAAVEDRA and told CS-1 that the eight kilograms would be in "Villao" (meaning Villavicencio, Colombia). Thereafter, on or about June 4, 2012, the CSs met with CANELAS RODRIGUEZ in Bogota, Colombia to discuss the impending sale of eight kilograms of cocaine to CS-1 and CS-2 in Villavicencio, Colombia.

9. On or about June 6, 2012, CS-2, CANELAS RODRIGUEZ, and Jennifer Colorado Alba (COLORADO ALBA) met in Villavicencio, Colombia to complete the sale of eight kilograms of cocaine to CS-1 and CS-2. CS-1 did not attend this meeting, but remained in the general area with the UC. CS-1 and the UC were posing as the individuals controlling the money for the purchase of the cocaine. CS-2, CANELAS RODRIGUEZ and COLORADO ALBA then went to the Unicentro shopping center in Villavicencio, Colombia and met with an

4

individual, who was later identified as Jorge Eliecer Arango Cardona (ARANGO CARDONA), and two other individuals. ARANGO CARDONA informed the group that the cocaine was located in a city about two hours from Villavicencio, and that they should travel to that location. CS-2, CANELAS RODRIGUEZ, ARANGO CARDONA, and others traveled by car to a cocaine stash house. Upon arrival at the stash house, ARANGO CARDONA presented a large quantity of cocaine to CS-2, and told CS-2 to pick out the eight kilograms of cocaine that CS-2 wished to purchase. CS-2 took a picture of the cocaine and sent it electronically to CS-1, who was waiting with the UC.

10. After CS-2 selected the eight kilograms at the stash house, CS-2, CANELAS RODRIGUEZ, ARANGO CARDONA and one of ARANGO CARDONA's associates traveled back to the Unicentro shopping center and waited for the eight kilograms to be delivered. CS-1 met the group at Unicentro, and instructed them to travel to a nearby hotel to complete the cocaine transaction. When the group arrived at the hotel, an individual arrived on a motorcycle and delivered a bag containing the cocaine to CS-1, CS-2 and the UC. The UC then brought the cocaine to a room within the hotel for inspection. After the UC inspected cocaine, the UC gave a bag containing $23,200 in U.S. currency to CANELAS RODRIGUEZ.

11. On or about June 7, 2012, CS-2 met with CANELAS RODRIGUEZ and COLORADO ALBA in Bogota. While CS-2 was with CANELAS RODRIGUEZ, CANELAS RODRIGUEZ contacted the defendant to coordinate their return travel to Cucuta, Colombia. At approximately 4:00pm that day, CS-2, CANELAS RODRIGUEZ and COLORADO ALBA met with the defendant to discuss the defendant's commission for brokering the eight kilogram transaction between the CSs and SANES SAAVEDRA. CANELAS RODRIGUEZ stated that

5

the commission payment owed to CANELAS RODRIGUEZ, the defendant and CS-2 was $800.00 each, for a total of $2,400.00. CANELEAS RODRIGUEZ transferred a commission to the defendant at this meeting as payment for brokering the deal. The defendant received approximately $400 - $500 for brokering this deal. CS-2 made a video recording of the defendant receiving his commission.

12. The approximately eight kilograms of suspected cocaine were seized by the DEA. A subsequent analysis confirmed that the substance was cocaine.

13. The defendant personally distributed, or it was reasonably foreseeable to the defendant that his co-conspirators distributed in furtherance of the conspiracy, at least eight kilograms of cocaine.

14. The acts taken by the defendant JOSE ABAD HEREDIA PRADO in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: *Mary Daly*
Mary K. Daly
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JOSE ABAD HEREDIA PRADO and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*Jose Abad Heredia*
_____
JOSE ABAD HEREDIA PRADO

I am JOSE ABAD HEREDIA PRADO's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Michael Arif, Esquire
Attorney for JOSE ABAD HEREDIA PRADO